NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

AMBER B., JODY B., *Appellants*,

*v.*

DEPARTMENT OF CHILD SAFETY, I.B., E.B., A.B., *Appellees*.

No. 1 CA-JV 21-0077
FILED 7-27-2021

Appeal from the Superior Court in Maricopa County
No. JD36780
The Honorable Julie Ann Mata, Judge

**AFFIRMED**

COUNSEL

Law Office of Ed Johnson, PLLC, Peoria
By Edward D. Johnson
*Counsel for Appellant Amber B.*

Robert D. Rosanelli Attorney at Law, Phoenix
By Robert D. Rosanelli
*Counsel for Appellant Jody B.*

Arizona Attorney General's Office, Mesa
By Amanda Adams
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Maria Elena Cruz delivered the decision of the Court, in which Presiding Judge Cynthia J. Bailey and Judge Jennifer M. Perkins joined.

---

**C R U Z**, Judge:

¶1        Amber B. ("Mother") appeals the superior court's order terminating her parental rights to her daughters A.B., E.B., and I.B. ("the children").    Jody B. ("Father") appeals the superior court's order terminating his parental rights to A.B. and E.B.  For the following reasons, we affirm.

### FACTUAL AND PROCEDURAL HISTORY

¶2        In December 2018, the Department of Child Safety ("DCS") received a report about the living conditions at the children's maternal grandmother's home, where the children lived with Mother and Father. DCS investigated and found animal feces, garbage, and rotting food in the home.  There were piles of clothing, trash, and furniture stacked to the ceiling which posed a hazard of falling on the children.  The investigator observed dangerous items within the children's reach, including pill and alcohol bottles, marijuana, drug paraphernalia, medication, a flask, sharp objects, buckets of water which posed a drowning threat, and wires and cords.   The investigator further observed two-year-old A.B. walking barefoot through the animal feces.  Although A.B. was a toddler, she was still primarily bottle-fed, and her nutrition came mostly from milk.  Mother allowed maternal grandmother to care for the children while the grandmother was under the influence of marijuana, which she told DCS she used daily to "control her seven personalities."

¶3        DCS removed the children from the home and filed a dependency petition.  At the time of the removal, the children had bedbug bites.   E.B. and I.B. disclosed witnessing domestic violence between maternal grandmother and her friend.  They reported they did not have enough food to eat, and that Mother and Father used marijuana.  Mother told DCS the children were "slow" and that E.B. was on the autism spectrum, but she had never sought a professional diagnosis.  A.B. and E.B. were later diagnosed with speech delays; E.B. was diagnosed with ADHD and was placed on an individualized education plan for developmental

delay. Mother told DCS she had a history of domestic violence with Father and had been sexually abused by him. Mother told DCS that she last used marijuana a month before the investigation and had not used methamphetamines for six years. Father told DCS he had last used methamphetamines a year before the investigation and had not used marijuana in five years. He acknowledged a history of domestic violence.

¶4          In February 2019, the superior court found the children were dependent. DCS instructed Mother and Father that before they could reunify with the children, they needed to provide a safe home for them, address their domestic violence problem, demonstrate that they could protect the children, meet their needs, and provide appropriate supervision.

¶5          DCS offered Mother and Father reunification services, including urinalysis testing, hair follicle testing, parent-aide services, case-aide services, visitation, individual counseling, psychological evaluations, psychiatric evaluation (Mother), substance abuse treatment (Father), transportation, case management services, and multiple referrals to Family Involvement Center for assistance with finding safe housing and for parenting classes and support.

¶6          Mother underwent a psychological evaluation with Dr. James S. Thal in March 2019. Mother denied that maternal grandmother's home had been in poor condition and did not understand why DCS had removed the children. Mother described maternal grandmother as having multiple personalities, including some that were "quite disturbing" or violent. Although the grandmother regularly had violent outbursts and could "flip out" and curse at the children at any time, Mother was not concerned about the children being around her. Mother denied that the children had ever been neglected or had witnessed domestic violence between herself and Father. Mother expressed a desire to divorce Father and told Dr. Thal that he was not involved in the children's care. Mother was unable to identify the most critical necessities a parent must provide a child. She told Dr. Thal that she had been tormented by a demon that told her what to do.

¶7          Dr. Thal diagnosed Mother with an intellectual disability and an adjustment disorder with mixed anxiety and depressed mood. Dr. Thal concluded that Mother's mental deficiency made her unable to understand her parenting responsibilities. Dr. Thal opined that Mother's prognosis for being able to demonstrate minimally adequate parenting skills in the foreseeable future was poor, and that a child in her care would be at risk for

neglect. Dr. Thal concluded that Mother was unable to parent independently.

¶8        Father underwent a psychological evaluation with Dr. Thal in March 2019. Father told Dr. Thal that he was the "breadwinner" and Mother was solely responsible for the children's care and would continue to be their full-time caregiver in the future. Dr. Thal gave Father a rule out diagnosis of antisocial personality disorder and diagnosed him with stimulant use disorder (methamphetamines) in early remission and alcohol use disorder. Dr. Thal noted that Father shared Mother's delusional thinking and also believed that a demon had been tormenting the family when they lived in Globe. Dr. Thal opined that a child would be at risk for neglect by Father if he were abusing alcohol and drugs and concluded that the prognosis for Father being able to demonstrate minimally adequate parenting skills in the future was "guarded." Besides Father's substance abuse, Dr. Thal found it "disturbing" that Father denied that grandmother's home had been unhygienic and unsafe for the children. Dr. Thal was also concerned that Father did not recognize that Mother's parenting skills were deficient. Dr. Thal noted that the "major concern" was that Father would likely be busy with work and delegate his parental responsibilities to Mother.

¶9        In October 2020, DCS moved to terminate Mother's parental rights to the children, and Father's parental rights to A.B. and E.B., pursuant to Arizona Revised Statutes ("A.R.S.") section 8-533(B)(8)(c) (fifteen months' out-of-home placement). As to Mother, DCS also moved to terminate parental rights pursuant to A.R.S. § 8-533(B)(3) (mental deficiency).

¶10        In February 2021, after a termination adjudication hearing, the superior court terminated Mother's and Father's parental rights on the grounds alleged in the motion. The court found that termination was in the children's best interests.

¶11        Mother and Father timely appealed, and we have jurisdiction pursuant to A.R.S. §§ 8-235(A), 12-120.21(A)(1), -2101(A)(1).

## DISCUSSION

¶12        Under Arizona law, before the superior court may terminate parental rights it must find that the moving party has proven one or more of the statutory grounds for termination by clear and convincing evidence. A.R.S. § 8-537(B). The court must also find by a preponderance of the evidence that termination is in the child's best interests. *Kent K. v. Bobby M.*,

210 Ariz. 279, 284, ¶ 22 (2005). We view the evidence and the reasonable inferences to be drawn from it in the light most favorable to affirming the superior court's termination order. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009). We will not reverse the superior court's order unless reasonable evidence does not support the superior court's factual findings. *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7 (App. 2010).

¶13 Mother and Father both argue that insufficient evidence supported the superior court's finding that termination was warranted under A.R.S. § 8-533(B)(8)(c). Neither parent challenges the superior court's best interests finding. The superior court may terminate parental rights under A.R.S. § 8-533(B)(8)(c) if DCS has made diligent reunification efforts, the parent has been unable to remedy the circumstances causing the parent's child to be in an out-of-home placement for fifteen months or longer, and "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future."

¶14 Here, the children had been in an out-of-home placement for more than two years when the superior court terminated Mother's and Father's parental rights. Father argues that he remedied the circumstances causing A.B. and E.B. to be in an out-of-home placement, and that there was no evidence he would be unable to effectively parent them in the near future. Mother argues no reasonable evidence supported the superior court's finding that she was unable to remedy the circumstances causing the children to be in an out-of-home placement and that DCS failed to make diligent efforts to provide her with appropriate reunification services.

¶15 DCS makes diligent efforts to provide reunification services when it provides a parent with the time and opportunity to participate in programs designed to help the parent become an effective parent. *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994). DCS need not provide "every conceivable service" or ensure that the parent actually participates in the services offered. *Id.* Nor is it required to provide a parent with unlimited time to take positive steps toward reunification. *Maricopa Cnty. Juv. Action No. JS-501568*, 177 Ariz. 571, 577 (App. 1994). DCS is not required to undertake futile reunification efforts and is required to undertake only those measures with a reasonable prospect of success. *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34 (App. 1999).

¶16 The record shows that DCS offered Mother case management services, urinalysis testing, mental health services, parenting classes

through Family Involvement Center, supervised visitation, case-aide services, parent-aide services, and transportation. The superior court recited at length the evidence supporting its conclusion that clear and convincing evidence demonstrated that DCS had made diligent reunification efforts but that those efforts proved unsuccessful. Sufficient evidence supported that determination.

¶17 In making a determination that a parent has been unable to remedy the circumstances causing the child to be in an out-of-home placement, we construe those circumstances to mean the circumstances existing at the time of the termination that prevented a parent from appropriately providing for the parent's child. *Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, 330, ¶ 22 (App. 2007); *see also Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 17, ¶ 26 (App. 2019) (court must consider "*both the origin [of the dependency] and any cause arising during the dependency*").

¶18 At the time of the termination adjudication hearing, Mother and Father had participated in many of the services DCS requested they participate in, including supervised visitation, drug testing, individual counseling, substance abuse treatment (Father) and psychological evaluations. Mother and Father also participated in some parenting classes but did not complete that service before the hearing.

¶19 Mother and Father participated in, but did not successfully complete, parent-aide services. The parent aide noted that Mother and Father allowed I.B. and E.B. to parent their younger sister. Father failed to consistently demonstrate adequate parenting skills and continued to believe that Mother could safely parent the children on her own. Mother failed to meet the children's needs, had to be reminded to practice basic hygiene during visits, and failed to recognize safety threats to the children. At times, Mother would disassociate or "zone out" during visits.

¶20 After Mother and Father were unsuccessfully closed out of parent-aide services, DCS arranged for a case aide to supervise visits with the children. Mother and Father were inconsistent with attending visits, but when they did attend were unable to control the two younger children's behaviors. The case aide reported that when Father attempted to discipline A.B. and E.B. Mother would remain seated and "continue[] with what she [was] occupied with." Neither Father nor Mother demonstrated an ability to provide the children with a clear expectation of how they should behave, and they did not follow through with consequences for bad behavior.

¶21          The superior court found that Mother and Father had made some improvements, but ultimately found that their efforts were insufficient. Over the course of the more than two-year dependency, Father never demonstrated an understanding of Mother's intellectual disability and her limitations as a caregiver. During the dependency, Mother and Father agreed to cooperate with a responsible adult who would need to be present when Father was at work to ensure the children's needs were met as part of an in-home safety plan, but they were unable to identify a suitable adult willing to fill that role. The DCS case manager testified that Father, who had not been involved in the children's care, would likely permit Mother to parent the children without supervision, placing them at risk of neglect. Sufficient evidence supported the superior court's determination that Mother and Father were unable to remedy the circumstances causing the children to be in an out-of-home placement for fifteen months or longer and that there was a substantial likelihood that they would not be capable of exercising proper and effective parental care and control in the near future. *See* A.R.S. § 8-533(B)(8)(c).

¶22          Because we affirm the superior court's termination of Mother's parental rights to the children on out-of-home placement grounds, we need not consider her challenge to the alternate ground of mental deficiency. *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 3 (App. 2002).

**CONCLUSION**

¶23          For the foregoing reasons, we affirm the superior court's order terminating Mother's parental rights to A.B., E.B., and I.B., and Father's parental rights to A.B. and E.B.



AMY M. WOOD • Clerk of the Court
FILED:     AA